**In the Matter of the WELFARE OF the CHILDREN OF D.M.T.-R., M.C., and unknown fathers, Parents.**

No. A10–2301.

Court of Appeals of Minnesota.

June 27, 2011.

John E. Mack, Mack & Daby, P.A., New London, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Jennifer K. Fischer, Kandiyohi County Attorney, Amy Isenor, Assistant Kandiyohi County Attorney, Willmar, MN, for respondent.

Susan Peterson–Bones, Willmar, MN, Guardian ad Litem.

Considered and decided by WRIGHT, Presiding Judge; SCHELLHAS, Judge; and WILLIS, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

WRIGHT, Judge.

Appellant-mother challenges the district court's termination of her parental rights to four of her children. She argues that the district court lacked subject-matter jurisdiction to terminate her parental rights to two of her children because they are not United States citizens. She also asserts that the district court erred by finding that her children suffered egregious harm while in her care and by not considering the citizenship of two of her children as a factor when analyzing whether the termination of appellant-mother's parental rights is in their best interests. For the reasons set forth below, we affirm.

## FACTS

The four children of appellant D.M.T.-R. who are the subjects of this appeal ranged in age from 2 to 7 years old when D.M.T.-R.'s parental rights to the children were terminated. The children are D.R., born December 15, 2003; M.R., born March 28, 2005; and twins A.C.-T. and A.C.-T. (collectively twins), born July 14, 2008. D.M.T.-R. also has a 17–year–old son, P.A.O., who has been in foster care since 2008. Although their country of citizenship is not established in the record, P.A.O., D.R., and M.R. are not United States citizens. They reside in the United States on refugee status, and their putative father, P.O., is believed to be incarcerated in Honduras. The twins, who were born in the United States, are United States citizens. Their putative father, M.C., has been removed from the country.

On February 20, 2009, P.A.O. advised respondent Kandiyohi County (county) that when he was on a home visit he locked himself, D.R., and M.R. in a bathroom to hide from D.M.T.-R. because she was shouting, uttering obscenities, and throwing objects at the children. That same month, county child-protection caseworkers observed that M.R. had a swollen blood-stained lip along with red marks and abrasions on her hip and back. M.R. told the caseworkers that these injuries were inflicted when D.M.T.-R. punched her in the back and face with a closed fist. D.R. also reported to the caseworkers that D.M.T.-R. punched M.R. and hit the twins when they would not go to sleep.

The county petitioned the district court to declare D.R., M.R., and the twins children in need of protection or services (CHIPS). At an April 6, 2009 hearing, D.M.T.-R. admitted that she was unable to provide appropriate shelter and care for her children because she was in custody on criminal charges at that time. The district court granted the CHIPS petition and ordered that the children remain in a foster-care setting under the custody and control of the county. In May 2009, D.M.T.-R. pleaded guilty to misdemeanor malicious punishment of a child, a violation of Minn. Stat. § 609.377, subds. 1, 2 (2008), and aggravated forgery, a violation of Minn. Stat. § 609.625, subd. 1(1) (2008). Shortly thereafter, D.M.T.-R., who is not a United States citizen, was removed from the United States to Honduras. With input from county social workers and others, the district court periodically reviewed and continued the county's temporary custody of the children.

The county contacted the Honduran Consulate as well as relatives of the children in Willmar, St. Cloud, Florida, and Honduras in its efforts to find a suitable placement for the children with a relative or to reunite the children with D.M.T.-R. Specifically, the county spoke with D.M.T.-R.'s two sisters, D.M.T.-R.'s brother and his wife, and D.M.T.-R.'s father. The county concluded that these relatives were either unwilling or unsuitable to care for

the children.[1] The county obtained passports for the twins to facilitate their transportation outside of the United States, if necessary. But the county was unable to obtain birth certificates for D.R. and M.R. or to confirm their citizenship. The county also facilitated visits between D.M.T.-R. and her children before D.M.T.-R.'s removal to Honduras and Internet video conference calls after D.M.T.-R. was removed.

On June 3, 2010, the county filed a termination-of-parental-rights (TPR) petition, seeking to terminate D.M.T.-R.'s parental rights to D.R., M.R., and the twins on three statutory grounds: (1) D.M.T.-R.'s palpable unfitness to be a party to the parent and child relationship, Minn.Stat. § 260C.301, subd. 1(b)(4); (2) the failure of reasonable efforts, under the direction of the district court, to correct the conditions leading to the children's out-of-home placement, Minn.Stat. § 260C.301, subd. 1(b)(5); and (3) the egregious harm experienced by the children while in D.M.T.-R.'s care, Minn.Stat. § 260C.301, subd. 1(b)(6). Following a hearing on the TPR petition, the district court terminated D.M.T.-R.'s parental rights to D.R., M.R., and the twins on the three statutory grounds asserted by the county. In doing so, the district court concluded that the statutory grounds had been proved and termination of D.M.T.-R.'s parental rights is in the best interests of the children. This appeal followed.

## ISSUES

I. Did the district court lack subject-matter jurisdiction to terminate appellant-mother's parental rights to her two children who are not United States citizens?

II. Did the district court err by finding that at least one of the statutory grounds

for terminating parental rights had been proved and by not considering the children's citizenship as a factor when conducting the best-interests analysis?

## ANALYSIS

### I.

■ D.M.T.-R. first asserts that the district court lacked subject-matter jurisdiction to terminate her parental rights to D.R. and M.R. because they are not United States citizens and federal courts have exclusive subject-matter jurisdiction over international child-custody matters. Whether subject-matter jurisdiction exists presents a question of law, which we review de novo. *Schroeder v. Schroeder,* 658 N.W.2d 909, 911 (Minn.App.2003).

Whether Minnesota courts have subject-matter jurisdiction over child-custody proceedings regarding children who are not United States citizens is an issue of first impression. We begin our analysis by examining the sources of subject-matter jurisdiction for child-protection proceedings in Minnesota courts. As a general matter, Minnesota district courts have original and exclusive subject-matter jurisdiction in CHIPS and TPR proceedings involving children who are present in the state, regardless of the child's legal residency. Minn.Stat. §§ 260C.101, subds. 1, 2(1), 260C.141, subd. 1(a) (providing that CHIPS petition may be filed regarding "a child *in* this state *or* . . . a child who is a resident of this state" (emphasis added)), 260C.307, subd. 1 (providing that TPR petition is to be filed in the same manner as provided in section 260C.141). In addition, the UCCJEA, Minn.Stat. §§ 518D.101–518D.317, confers subject-matter jurisdic-

---

**1.** D.M.T.-R.'s sister in Florida advised the county that, if the children were placed in her custody, she would violate the custody order and return the children to D.M.T.-R. in Honduras. She also failed a background check. D.M.T.-R.'s other sister, brother, and father advised the county that they could not or did not want to take custody of the children.

tion to Minnesota district courts when rendering "an initial child custody determination" in child-custody proceedings if Minnesota is the child's "home state." Minn.Stat. § 518D.201(a)(1). And the district court that makes an initial child-custody determination has continuing, exclusive subject-matter jurisdiction over the child-custody proceedings. Minn.Stat. § 518D.202(a). Under the UCCJEA, a "child custody determination" includes determinations made in both CHIPS and TPR proceedings; and a child's "home state" is the state where the child lived with a parent for at least six consecutive months immediately before a child-custody proceeding is commenced. Minn.Stat. § 518D.102(d), (e), (h).

Minnesota courts have applied the UCCJEA in the context of interstate jurisdictional disputes. For example, in *Reed v. Albaaj*, we held that a Minnesota district court properly exercised subject-matter jurisdiction under the UCCJEA to render a child-custody decision, even though appellant-father resided in another state, because respondent-mother and the children had resided in Minnesota for nearly seven months before the child-custody proceeding commenced. 723 N.W.2d 50, 53, 56 (Minn.App.2006). Also under the UCCJEA, Minnesota courts "shall treat [an Indian tribe] as if it were a state of the United States" when applying the general and jurisdictional provisions of the UCCJEA. Minn.Stat. § 518D.104(b); *accord Gerber v. Eastman*, 673 N.W.2d 854, 855, 858 (Minn.App.2004) (citing Minn.Stat. § 518D.104(b)) (rejecting appellant-father's contention that UCCJEA does not apply to, and tribal court has exclusive jurisdiction over, child-custody proceeding regarding Indian child and biological Indian mother), *review denied* (Minn. Mar. 16, 2004).

Similarly, Minnesota courts "shall treat a foreign country as if it were a state of the United States" for purposes of applying the general and jurisdictional provisions of the UCCJEA. Minn.Stat. § 518D.105(a). Although we have not interpreted section 518D.105(a) as it applies to children who are not United States citizens, we have held that the predecessor to the UCCJEA, the Uniform Child Custody Jurisdiction Act (UCCJA), conferred subject-matter jurisdiction to Minnesota courts in child-custody proceedings when one parent is a citizen of and resides in a foreign country. *Abu–Dalbouh v. Abu–Dalbouh*, 547 N.W.2d 700, 702, 704 (Minn. App.1996). In *Abu–Dalbouh*, respondent-mother, a United States citizen, fled her abusive husband who lived in the country of Jordan and brought their three children to Minnesota. *Id.* at 702. And we held that the UCCJA applies to international child-custody matters. *Id.* at 704. Our holding in *Abu–Dalbouh* has persuasive value here because the UCCJEA that we apply here includes a provision similar to the UCCJA's provision regarding the subject-matter jurisdiction of Minnesota courts that extends to international child-custody matters. *Compare* Minn.Stat. § 518A.23 (1998) (repealed 1999) (providing that "the general policies of [the UCCJA] extend to international proceedings") *with* Minn.Stat. § 518D.105 (providing that Minnesota courts must treat a foreign country as if it were a state of the United States for the purpose of applying the general and jurisdictional provisions of the UCCJEA, and a child-custody determination made in a foreign country must be recognized and enforced under the UCCJEA unless the child-custody law of the foreign country violates fundamental human-rights principles).

Because uniform laws such as the UCCJEA are intended to encourage the development of a common jurisprudence

among the courts adopting them, we give great weight to the interpretation and application of a uniform law by other state judiciaries. Minn.Stat. § 645.22 (2010); *Johnson v. Murray,* 648 N.W.2d 664, 670 (Minn.2002). Other state courts have treated foreign countries the same as another state for the purpose of exercising subject-matter jurisdiction over child-custody and paternity proceedings under the UCCJEA. *See, e.g., Bellew v. Larese,* 288 Ga. 495, 706 S.E.2d 78, 78, 81 (2011) (holding that Georgia district court had subject-matter jurisdiction over child-custody proceeding regarding minor with dual Italian and United States citizenship when one parent was citizen of and resided in Italy); *Carter v. Carter,* 276 Neb. 840, 758 N.W.2d 1, 7 (2008) (observing that the UCCJEA treats a foreign country as a state of the United States); *In re Calderon–Garza,* 81 S.W.3d 899, 902–04 (Tex.App.2002) (holding that Texas district court had subject-matter jurisdiction over paternity proceeding regarding minor born in Texas and taken to Mexico by mother, a Mexican citizen, one day before putative father commenced paternity action). Although these cases do not involve children who are not United States citizens, in each case, the state court decided the issue of subject-matter jurisdiction, as the district court did here, based on the state in which the child and a parent resided for the requisite six-month period before the child-custody proceeding commenced, without consideration of the child's citizenship.

By contrast, federal courts generally refrain from deciding child-custody matters. For example, the domestic-relations exception to federal diversity jurisdiction divests the federal courts of subject-matter jurisdiction over child-custody decrees. *Ankenbrandt v. Richards,* 504 U.S. 689, 702–03, 112 S.Ct. 2206, 2214–15, 119 L.Ed.2d 468 (1992) (citing *In re Burrus,* 136 U.S. 586, 594, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890)). In discussing the "sound policy considerations" for this divestiture, the *Ankenbrandt* court observed that "state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over divorce, alimony, and child custody decrees." *Id.* at 703–04, 112 S.Ct. at 2215. Similarly, the federal district court in *Bromley v. Bromley* concluded that,

except for the limited matters of international abduction expressly addressed by the [Hague] Convention [on the Civil Aspects of International Child Abduction], [child custody matters] would better be handled by the state courts which are more numerous and have both the experience and resources to deal with this special area of the law.

30 F.Supp.2d 857, 862 (E.D.Pa.1998); *accord Teijeiro Fernandez v. Yeager,* 121 F.Supp.2d 1118, 1125–26 (W.D.Mich.2000) (holding that, because Hague Convention on the Civil Aspects of International Child Abduction lacks specific remedy for rights of access to children, "matters relating to access are best left to the state courts, which are more experienced in resolving these issues").

Moreover, federal immigration law recognizes state-court jurisdiction over the custody and care of juveniles who are not United States citizens. *See, e.g.,* 8 U.S.C. § 1101(a)(27)(J)(i) (2006) (defining "special immigrant" as an immigrant who is present in the United States and has been placed under the custody of an agency or department of a state by a juvenile court under state law); 8 C.F.R. § 204.11 (2011) (permitting "special immigrant" status for alien juveniles who have been declared dependent on a juvenile court having jurisdiction under state law).

Thus, we conclude that the UCCJEA confers to state courts subject-matter jurisdiction over child-custody proceedings, including the termination of parental rights involving a child who is not a United States citizen but who is in Minnesota. And we observe that our conclusion is not inconsistent with federal law. Because it is undisputed that D.R. and M.R. resided in Minnesota with D.M.T.-R. for more than six consecutive months before the commencement of the CHIPS and TPR proceedings at issue here, we hold that the district court had original and continuing subject-matter jurisdiction in the proceedings to terminate D.M.T.-R.'s parental rights to D.R. and M.R. regardless of the children's citizenship.

## II.

We next consider whether the decision to terminate D.M.T.-R.'s parental rights is legally sound. Our review of the district court's decision to terminate parental rights is limited to determining whether the district court's findings address the statutory criteria and whether they are supported by substantial evidence. *In re Welfare of D.D.G.,* 558 N.W.2d 481, 484 (Minn.1997). Although the district court terminated D.M.T.-R.'s parental rights on three statutory grounds, we will not disturb the district court's decision to terminate parental rights if there is clear-and-convincing evidence establishing at least one of the grounds for termination of parental rights set forth in Minn.Stat. § 260C.301, subd. 1(b), and if termination of parental rights is in the child's best interests. Minn.Stat. § 260C.301, subd. 7; *In re Welfare of Children of S.E.P.,* 744 N.W.2d 381, 385 (Minn.2008).

Minnesota law permits the involuntary termination of parental rights to a child if there is clear-and-convincing evidence that a child has experienced egregious harm in the parent's care which is of a nature, duration, or chronicity that indicates a lack of regard for the child's well-being, such that a reasonable person would believe it contrary to the best interest of the child or of any child to be in the parent's care.

Minn.Stat. § 260C.301, subd. 1(b)(6); *see In re Welfare of Children of R.W.,* 678 N.W.2d 49, 55 (Minn.2004) (standard of proof). "Egregious harm" is defined as "the infliction of bodily harm to a child or neglect of a child which demonstrates a grossly inadequate ability to provide minimally adequate parental care." Minn.Stat. § 260C.007, subd. 14. The definition also includes a nonexclusive list of specific conduct directed toward a child, including conduct that constitutes third-degree assault. *Id.,* subd. 14(6). Third-degree assault includes, among other offenses, a *pattern* of child abuse constituting acts of fifth-degree assault committed against a minor. Minn. Stat. §§ 609.223, subd. 2, 609.185(b) (2010). Fifth-degree assault includes an act committed "with intent to cause fear in another of immediate bodily harm or death" or the intentional infliction of or attempt to inflict bodily harm on another. Minn.Stat. § 609.224, subd. 1 (2010).

The district court specifically found that D.M.T.-R. inflicted bodily harm on D.R., M.R., and the twins on multiple occasions by hitting them with her hands and with a belt and by punching M.R. in the mouth on at least one occasion. The district court also found that D.M.T.-R. tied D.R. and M.R. to chairs, taped their mouths shut, locked them in the basement, and told them that snakes and blood-sucking animals would harm them there. The district court also found that, because of the past trauma inflicted by D.M.T.-R., D.R. suffers from anger problems and both D.R. and M.R. have attachment problems. The testimony of two child-protection casework-

ers, the guardian-ad-litem reports, and photographs of the children's injuries support the district court's findings. These findings, which are amply supported by the record, are more than sufficient to establish that the children endured a past pattern of child abuse by D.M.T.-R. that constitutes third-degree assault such that a reasonable person would believe it is contrary to the best interests of *any* child to be in D.M.T.-R.'s care. Accordingly, the district court's conclusion that D.M.T.-R.'s children experienced egregious harm in her care is legally sound.[2]

■ D.M.T.-R. also challenges the district court's determination that termination of D.M.T.-R.'s parental rights is in the children's best interests, arguing that the district court's consideration was inadequate because the citizenship of D.R. and M.R. was not considered. The best-interests analysis in a TPR proceeding requires the district court to balance the child's interest in preserving the parent and child relationship, the parent's interest in preserving the parent and child relationship, and any competing interests of the child. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn.App.1992). "Competing interests include ... a stable environment, health considerations and the child's preferences." *R.T.B.*, 492 N.W.2d at 4. If the interests of the parent and the child conflict, the child's interests are paramount. Minn.Stat. § 260C.301, subd. 7.

The district court's best-interests analysis was thorough and included several relevant factors. For example, the district court found, and the record reflects, that D.R. and M.R. suffer from attachment problems as a result of past trauma inflicted by D.M.T.-R. and that one of the twins has behavioral difficulties. The district court also found that the children lack interest in maintaining contact with D.M.T.-R. and they appear unwilling to maintain that contact. But they have a close relationship with each other, their older brother, P.A.O., and their foster parents. They also have visited their maternal uncle and his family. The older children attend elementary school and participate in sports activities, the twins interact with peers, and all four children attend Sunday school. The district court also found that there are community activities available for the children to maintain their Honduran heritage. When viewed in totality, the district court's findings more than satisfy the legal requirements for a best-interests analysis in a TPR case. D.M.T.-R. cites no legal authority requiring the district court to consider the children's citizenship when assessing the children's best interests. And the record provides no basis for a determination that the district court's robust best-interests analysis was inadequate for that reason.[3] Accordingly, D.M.T.-R.'s challenge to the termination of her parental rights on this ground fails.

## DECISION

Under the child-protection provisions of the Juvenile Court Act, Minn.Stat.

---

2. In light of our conclusion that D.M.T.-R.'s actions satisfy this statutory ground for terminating her parental rights, we need not address the two additional statutory grounds on which the district court relied or whether the county made reasonable efforts to rehabilitate D.M.T.-R. and reunite the family. *See* Minn. Stat. §§ 260C.301, subd. 1(b) (providing that only one statutory ground is necessary to terminate parental rights), 260.012(a)(1) (2010) (providing that reasonable efforts at reunification are required unless parent has subjected a child to egregious harm).

3. Indeed, the record reflects that this issue was not clearly presented to the district court. Rather, D.M.T.-R. referenced citizenship only vaguely in her written summation to the district court after the TPR hearing.

§§ 260C.001–260C.451, and the Uniform Child Custody Jurisdiction and Enforcement Act, Minn.Stat. §§ 518D.101–518D.317, the district court had original and continuing subject-matter jurisdiction over the termination of D.M.T.-R.'s parental rights to D.R. and M.R. The district court did not err by concluding that D.M.T.-R.'s children experienced egregious harm in her care or by finding, without express consideration of the citizenship of D.R. and M.R. as a best-interests factor, that termination of D.M.T.-R.'s parental rights is in the best interests of her children.

**Affirmed.**